**ALLSTATE INSURANCE COMPANY, an Illinois Corporation, Plaintiff and Appellant,**

v.

**Nelson Christian DORR and Aeda Dorr, his wife, surviving parents of Felix Matthew Dorr, Deceased, et al., Defendants and Appellees.**

**No. 22443.**

United States Court of Appeals
Ninth Circuit.

May 2, 1969.

David L. Haga, Jr. (argued), of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for appellant.

Kenneth Rosengren (argued), Phoenix, Ariz., for appellee Dorr, J. Gordon Cook (argued), of McKesson, Renaud, Cook, Miller & Cordova, Phoenix, Ariz., for appellees Lombardo & Badger Mut. Ins. Co.

Jennings, Strouss, Salmon & Trask, Phoenix, Ariz., for appellee Gutierrez.

Before MADDEN,* Judge of the United States Court of Claims and MERRILL and HUFSTEDLER, Circuit Judges.

---

* Senior Judge, The United States Court of Claims, sitting by designation.

MADDEN, Judge:

The plaintiff Allstate brought this suit in the United States District Court for Arizona, which court had jurisdiction because of the diversity of citizenship of the parties, and the amount in controversy. The suit sought a declaratory judgment to the effect that a certain liability insurance policy which Allstate had issued to a Mrs. Gutierrez, was invalid because Mrs. Gutierrez had obtained the policy from Allstate by false and fraudulent representations which were material to Allstate in inducing it to issue the policy. The policy covered liability to third persons which liability Mrs. Gutierrez might be subjected to in connection with the driving of a certain automobile by herself or by other persons with her permission. While the automobile was being driven, with Mrs. Gutierrez' permission, by one Lombardo, it struck the infant son of the appellees, Mr. and Mrs. Dorr and inflicted injuries which resulted in the son's death. Thereafter Mr. Dorr, as the father of his deceased son, brought a suit against Mrs. Gutierrez and Lombardo, and obtained a judgment against them for $20,000.00. By appropriate proceedings in the nature of garnishment, Mr. Dorr would have been able, assuming the validity of Allstate's liability policy, to collect from Allstate, up to the limits of its policy, and with appropriate adjustment for other liability insurance which Lombardo had with Safeco, another insurance company, his judgment against Mrs. Gutierrez and Lombardo. There is no issue in this case as to the fact of Mrs. Gutierrez' misrepresentations to Allstate, or as to their sufficiency to enable Allstate to cancel her policy in proper circumstances. The

Dorrs made a motion for summary judgment against Allstate, dismissing Allstate's complaint. In acting upon this motion, the court was required to take the allegations of Allstate's complaint as to Mrs. Gutierrez' false representations, the allegations being supported by affidavits, as true. The court granted the motion of the Dorrs.

The summary judgment against Allstate was based upon the District Court's view that Subsection F, Arizona Revised Statutes, § 28–1170,[1] applied to all motor vehicle liability polices in Arizona and caused the liability of insurance companies to become absolute, at the time that an accident occurred, with respect to damage arising out of that accident, regardless of the fact that the insured had procured the policy by fraud.

Allstate does not here contend that the District Court was in error in its estimate of the meaning which the Supreme Court of Arizona had, in other relevant cases, given to the Arizona statute. Allstate's contention is that the Arizona statute, construed as the Arizona Court had construed it, was unconstitutional and invalid; that it is arbitrary and unreasonable for a legislature, by its fiat, to provide that although one is induced by fraud to enter into a contract which he would not have entered into if he had not been fraudulently misled, he is nevertheless bound by his contract. Allstate does not, of course, contend that the Arizona statute makes a fraudulently induced liability insurance contract enforceable in all circumstances. The statute does not so provide, and one can hardly imagine that any legislature would enact a statute which did so provide.

1. A.R.S. § 28–1170, subsec. F. Every motor vehicle liability policy shall be subject to the following provisions which need not be contained therein:
 1. The liability of the insurance carrier with respect to the insurance required by this chapter shall become absolute when injury or damage covered by the motor vehicle liability policy occurs.

The policy may not be cancelled or annulled as to such liability by an agreement between the insurance carrier and the insured after the occurrence of the injury or damage, and no statement made by the insured or on his behalf and no violation of the policy shall defeat or void the policy.

At an earlier period, though not much earlier, in our legal history many attacks were made upon legislation, usually state legislation, on the asserted ground that the legislation deprived persons of liberty of contract, one of the liberties guaranteed by the Fourteenth Amendment. An example was the case of Lochner v. New York, 198 U.S. 45, 53, 57, 25 S.Ct. 539, 541, 49 L.Ed. 937 (1905). Lochner was fined for permitting employees in his bakery to work more than 60 hours a week and more than ten hours a day, in violation of a New York statute setting those upper limits on bakery employment. Mr. Justice Peckham said, for the Court: "The general right to make a contract in relation to his business is part of the liberty of the individual protected by the Fourteenth Amendment of the Federal Constitution." The court went on to say, of the New York statute: "There is no reasonable ground for interfering with the liberty of person or the right of free contract, by determining the hours of labor, in the occupation of a baker". Mr. Justice Holmes, then a relatively new member of the Supreme Court, dissented in Lochner, as did Justices Harlan and Day.

The Supreme Court's decisions, both before and after Lochner, in cases involving legislative restrictions on the liberty of contract concerning economic matters, did not follow a consistent course. In the year 1937, a notable year in our Constitutional law, in which year the power of Congress under the Commerce Clause of the Constitution was greatly expanded, the Supreme Court, in the case of West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, held valid a statute of the State of Washington fixing minimum wages for women and minors. The Supreme Court has not for several decades, invalidated any state economic regulations on the liberty of contract ground. In 1963, in the case of Ferguson, Att'y General of Kansas v. Skrupa, 372 U.S.

726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, the Court, in sustaining the validity of a Kansas statute, reversed the United States District Court for Kansas, and said: "We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies who are elected to pass laws."

In the light of the above indicated status of legal doctrine, Allstate has undertaken a heavy burden indeed in asking us to invalidate the Arizona statute here involved. We think the statute, far from being irrational and arbitrary, was easily supportable. When Allstate sold the policy to Mrs. Gutierrez, relying on her word that she was a normally safe driver, it armed her with what could become a dangerous instrumentality in her hands. It could keep her on the road, in a jurisdiction which required a driver to be insured. In fact, Mrs. Gutierrez had failed her driver's test, had, within five years preceding the application for the policy, been fined for driving while under the influence of liquor, for reckless driving, and for running a red light. When Allstate, after the Dorr's son had been killed by the insured automobile, desired to get into a position in which it could treat the policy as void ab initio, it had no difficulty in learning, from the proper official source, all of the facts which, if known at the time the policy was issued, would have prevented it from being issued. To the suggestion that Allstate might follow the practice of, shortly after selling a policy, obtaining from the proper office an abstract of the insured's past driving history and, if it was bad, as Mrs. Gutierrez' was, then and there taking the necessary steps to cancel the policy. Allstate's answer was that it would be quite unreasonable to expect Allstate to do that, in view of the thousands of policies which it issues. One gets the impression that an insurance company is so busy with the thousands of dollars that it collects in premiums that it is unrea-

sonable to expect it to give any attention to the pennies which it would have to spend to keep some of the unsafe drivers off the roads.

The Legislature of Arizona, and those of all the States, are constantly engaged in trying to do whatever can be done to mitigate the tragedy of our roads, which like a war or a devastating plague, kills and maims the people. For the Legislature to conclude that an insurance company, which has been paid for taking the risk of compensating, within the limits of its policy, the victim of the negligence of its insured, must not be allowed to disavow its responsibility after the tragedy has occurred, could have been regarded by the Legislature as at least a small step in the direction alleviating the irreparable damage which the victim of the road accident or his family have suffered. It was not a long step, but it was a step. It meant that if one subjected himself to the perils of the road, taking some comfort from the fact that most drivers are careful, and that many, perhaps most, drivers carry liability insurance, he would not have to undergo the poignant experience of being crippled by a careless driver and then, in rapid succession, being impoverished by the cancellation, by that driver's insurance company, of the policy which would have given him some compensation for his misfortune.

We think that the economic burden placed by the Arizona statute upon companies which sell liability insurance of paying an occasional claim which they would not, but for the statute, have had to pay, falls easily within the power of a legislature to legislate. Insurance companies can alleviate their situation by exercising more care in selling their policies, by exerting more diligence in earlier discovery of their mistakes, and, of course, by increasing their insurance rates to spread the cost over larger numbers of the motoring public.

The judgment of the District Court is affirmed.